IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

DOMINGO NAJERA-PEREZ,

Defendant.

CRIMINAL ACTION NO.
1:12-CR-232-CAP-LTW

## MAGISTRATE JUDGE'S ORDER AND REPORT AND RECOMMENDATION

This case is before the court on Defendant's First Particularized Motion to Suppress Evidence and Statements (Docket Entry 74), Motion for Disclosure and Interview of Government Informants and/or an In Camera Hearing (Docket Entry 75), and First Particularized Motion to Suppress Evidence and Statements Illegally Seized Pursuant to Title III Orders (Docket Entry 82).  For the reasons that follow, Defendant's Motions should be **DENIED**.  Docket Entries [74, 75, 82].

### DEFENDANT'S FIRST PARTICULARIZED MOTION TO SUPPRESS EVIDENCE AND STATEMENTS ILLEGALLY SEIZED PURSUANT TO TITLE III ORDERS

## I.    FACTUAL BACKGROUND

On July 25, 2012, the grand jury charged Defendant Domingo Najera-Perez ("Defendant") with (1) possession and distribution, conspiracy, and aiding and abetting

others in order to possess and distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, 18 U.S.C. § 2; and (2) money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956.  Docket Entry [1].

Prior to Defendant's indictment and arrest, agents from the Drug Enforcement Agency ("DEA") obtained multiple Orders pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 from District Judges Richard Story, Timothy Batten, and Thomas Thrash of the Northern District of Georgia from February through April of 2011.  The Orders authorized wiretaps of telephones used by individuals believed to be involved in trafficking methamphetamine in the metro-Atlanta area. (Gov't's Ex. A, Aff., p. 11).  Defendant argues evidence obtained as a result of the wiretaps should be suppressed because (1) the wiretap applications were not supported by probable cause; (2) the Government failed to show that the wiretaps were a necessity; (3) the Government failed to properly specify the individuals whose calls would be intercepted; (4) the Government did not use proper procedures to minimize the interception of communications not otherwise subject to interception; (5) the description of the type of communication to be intercepted within the applications and the orders authorizing the wiretaps were inadequate; and (6) the wiretap applications and the orders permitting the wiretaps were defective because they did not clearly identify the person claiming to be the designated official who may authorize the wiretaps or indicate to whom the authority to apply for wiretaps has been delegated.

### A.   Judge Story's Wiretap Order of February 4, 2011: Target Telephone 1

On February 4, 2011, U.S. District Court Judge Richard Story issued an Order permitting the DEA to intercept a Sprint cellular telephone number xxx-xxx-2386,[1] Target telephone 1 (hereinafter "TT1"), believed to be used by Alejandro Maldonado who was suspected of being a multi-pound methamphetamine distributor.  Judge Story also separately issued an Order allowing the DEA to obtain Global Position System ("GPS") data for TT1.  (Gov't's Ex. A, Orders).  DEA Special Agent Michael Connolly ("Special Agent Connolly") indicated in the application for the wiretap and the GPS information on the target telephone that he believed interception of calls on TT1 would lead agents to information concerning the offenses of distribution and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1); the importation of controlled substances in violation of 21 U.S.C. §§ 952, 960; the unlawful use of communication facilities in committing or facilitating the commission of a Title 21 felony offense in violation of 21 U.S.C. § 843(b); the conspiracy to import, distribute, and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846, 963; money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956, 1957; and aiding and abetting all of the aforementioned offenses in violation of 18 U.S.C. § 2.  (Gov't's Ex. A, Affidavit of Michael Connolly, hereinafter "Connolly Aff.," ¶ 10).  Special Agent Connolly supported his application

---

[1]   The initial digits of each target telephone number have been omitted to protect the privacy of the users of the telephone numbers.

3

with his own Affidavit which relied upon evidence obtained from previous wiretap interceptions of coded conversations between Maldonado and an unidentified male known as "Pelon," whom law enforcement believed to have assisted Maldonado and others in the distribution of drugs.  (Gov't Ex. A, Connolly Aff. ¶¶ 24-32).

### B.   Judge Batten's Wiretap Order of March 7, 2011: Target Telephones 3-5

On March 7, 2011, U.S. District Court Judge Timothy C. Batten issued a subsequent wiretap order for target telephones three through five relying upon a forty-eight page Affidavit submitted by Special Agent Connolly.  See, generally, Ex. B.  This time, Special Agent Connolly sought to intercept (a) xxx-xxx-8247, target telephone three ("TT3"), believed to be used by an unidentified male known as "Borrego,"  (b) xxx-xxx-8628, target telephone four ("TT4"), believed to be used by an unidentified female known as "Lidia," and (c) xxx-xxx-9226, target telephone five ("TT5"), believed to be used by Maldonado.  (Ex. B, Mar. 7, 2011 Aff. of Special Agent Connolly, hereinafter "Connolly 2 Aff.,"  ¶ 9).  Judge Batten also separately issued an Order allowing the DEA to obtain GPS data for target telephones three through five.  Special Agent Connolly indicated in his Affidavit in support of the application for wiretaps that he obtained evidence from prior wiretaps, including the interception of calls for TT1, to support the notion that there was probable cause for the interception of communications of target telephones three through five.  (Connolly 2 Aff. ¶¶ 21-36). Connolly believed that the interceptions of target telephones three through five would

4

lead to information about the commission of the same crimes as indicated in the Affidavit in support of the interception of TT1.  (Connolly 2 Aff. ¶ 10).

### C.   Judge Thrash's Wiretap Order of April 1, 2011: Target Telephones 5-9

On April 1, 2011, U.S. District Court Judge Thomas W. Thrash signed an Order allowing the continued interception of target telephone five, and the interceptions of target telephones six through nine. See, generally, Ex. C.  Judge Thrash also separately issued an Order allowing the DEA to obtain GPS data for target telephones five through nine.  In the wiretap application, Special Agent Connolly requested authority to continue to intercept communications on TT5, used by Maldonado, and to begin intercepting communications on (a) xxx-xxx-6918, target telephone six ("TT6"), believed to used by an unidentified male known as "Calimba;" (b) xxx-xxx-7757, target telephone seven ("TT7"), believed to used by Defendant; (c) xxx-xxx-7413, target telephone eight ("TT8"), believed to used by Borrego; and (d) xxx-xxx-9052, target telephone nine ("TT9"), believed to used by Maldonado.  (Ex. C, April 1, 2011 Aff. of Michael Connolly, hereinafter "Connolly 3 Aff.," ¶ 9).   Connolly believed that the continued interception of communications on TT5, and the interceptions of communications on TT6 through TT9 would lead to information about the commission of the same crimes as indicated in the affidavits in support of the interceptions of TT1 through TT5. (Connolly 3 Aff. ¶ 10).

## II.   **DISCUSSION**

Defendant argues evidence obtained as a result of the wiretaps should be suppressed because (1) the wiretap applications were not supported by probable cause; (2) the Government failed to show that the wiretaps were a necessity; (3) the Government failed to properly specify the individuals whose calls would be intercepted; (4) the Government did not use proper procedures to minimize the interception of communications not otherwise subject to interception; (5) the description of the type of communication to be intercepted within the applications and the orders authorizing the wiretaps were inadequate; and (6) the wiretap applications and the orders permitting the wiretaps were defective because they did not clearly identify the person claiming to be the designated official who may authorize the wiretaps or indicate to whom the authority to apply for wiretaps has been delegated.

### A.   **The February 4, 2011 Wiretap Order (TT1) was Supported by Probable Cause**

Defendant argues the February 4, 2011 Order permitting law enforcement to intercept TT1was unlawful because it was not supported by probable cause and the evidence obtained as a result should be suppressed.  In response, the Government contends that there was sufficient factual basis within Special Agent Connolly's forty-one page Affidavit to provide probable cause for the wiretap order.

Section 2518(3) of Title III requires that a wiretap order be supported by probable cause to believe that (1) an individual is committing, or has committed, or is about to

6

commit an offense enumerated in 18 U.S.C. § 2516, (2) that particular communications concerning that offense will be obtained through use of the wiretap, and (3) the telephone to be intercepted is being used in connection with the commission of such offense.  18 U.S.C. § 2518(3).  An application for a wiretap must be supported by the same probable cause necessary for a search warrant.  United States v. Nixon, 918 F.2d 895, 900 (11th Cir.1990).  Thus, the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability of finding evidence of a crime.  Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999); United States v. Miller, 24 F.3d 1357, 1361 (1994); Nixon, 918 F.2d at 900.  "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361. "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361; Nixon, 918 F.2d at 900.  The practical nature of the decision to issue a warrant "justifies 'great deference' upon review" and calls for upholding the issuing judge's findings "even in marginal or doubtful cases." Nixon, 918 F.2d at 900.

Applying the law to the facts of this case, ample evidence from Special Agent Connolly's Affidavit filed in support of the wiretap order application supports the district judge's finding that there is probable cause to believe that the target subjects were committing crimes enumerated in 18 U.S.C. § 2516 and that information about those crimes would be obtained by intercepting Maldonado's cellular communications. Special Agent Connolly stated that through prior wire tap interceptions agents have determined that Maldonado is a multi-pound methamphetamine distributor in the Atlanta, Georgia area and that Maldonado has been involved in the shipment of hundreds of pounds of marijuana from Texas to Georgia. (Connolly Aff. ¶ 21). Special Agent Connolly, who has participated in more than fifty drug-related arrests, received hundreds of hours of training in the enforcement of drug and money laundering laws, the investigation of drug trafficking and drug organizations, and drug terminology, states that he is familiar with the ways that drug traffickers conduct their business, use cellular telephones, and use code words to conduct their transactions. (Connolly Aff. ¶¶ 2-5). Special Agent Connolly attested that although Maldonado used coded messages to accomplish drug transactions,[2] based on his experience and training, Special Agent Connolly can discern that a number of previously intercepted telephone conversations

---

[2] Courts considering wiretap applications are allowed to rely upon the reasonable interpretations given by experienced law enforcement affiants as to the code, slang, or obtuse language used in conspiratorial communications. United States v. Flores, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *24 n.16 (N.D. Ga. Sept. 27, 2007) (reasoning that if a jury can properly consider such evidence, that a district judge may take such information into consideration as well), citing United States v. Novaton, 271 F.3d 968, 1009 (11th Cir. 2001) (allowing police officer to testify at trial as to meaning of code words during intercepted conversations).

shows that Maldonado was involved in trafficking drugs.  (Connolly Aff. ¶¶ 1-8, 21).

For instance, based on an intercepted conversation in which Maldonado advised an

individual in Mexico that "the cubes were at fourteen," agents could discern that

Maldonado was distributing crystal methamphetamine (known as "ice" or "cubes")

because based on the affiant's knowledge, the current price for a pound of crystal

methamphetamine is $14,000.    (Connolly Aff. ¶ 21).    In another intercepted

conversation, Maldonado told "Quinni" (whose first and last name s are unknown) to

go to the Food Depot at 3:30, asked Quinni if he knew "the fat guy," and after Quinni

indicated that he knew the fat guy, Maldonado told Quinni that the fat guy would bring

Quinni a "package," that Quinni should leave the car by the curb, drive around with the

third party, and then the third party would drop Quinni off.  (Connolly Aff. ¶ 24).

Maldonado also advised Quinni to "take a jacket" and to "put it there."  (Id.).  Special

Agent Connolly, based on his experience, believes that Maldonado was telling Quinni

to go to the Food Depot and meet the drug customer ("the fat guy"), who would be

turning over drug proceeds (the "package").  Special Agent Connolly believes that when

Maldonado told Quinni to "leave the car by the curb," he was directing Quinni to get in

the car with the customer, which is a common practice so that law enforcement cannot

witness the drug transaction.  Based on this conversation, Special Agent Connolly

believes that Maldonado instructed Quinni to bring a jacket so that he could hide the

drug proceeds.  (Connolly Aff. ¶ 24).  In another intercepted call, Quinni asked

Maldonado if he should take "the ticket" over there and Maldonado replied that he

AO 72A
(Rev.8/82)

needed the ticket to deliver to the guy.  (Connolly Aff. ¶ 25).  Maldonado also advised Quinni that "he urgently needed that" because "they were calling and calling him." (Connolly Aff. ¶ 25).  Special Agent Connolly's interpretation is that Quinni was asking Maldonado if he should take the drug proceeds ("ticket") to a particular location, and Maldonado replied that he needed the drug proceeds delivered to his source of supply. (Connolly Aff. ¶ 25).

In addition, Special Agent Connolly's Affidavit connected TT1 to Maldonado and drug activity.  First, Special Agent Connolly believed that Maldonado had stopped using his previous telephone number and switched to TT1 because an analysis of pen registers revealed that Maldonado's girlfriend stopped communicating with Maldonado's prior telephone number on the same day she began communicating with TT1.  (Connolly Aff. ¶ 26).  Moreover, records show that a device bearing the new telephone number was used to contact approximately forty-five of the same telephone numbers previously dialed on Maldonado's former telephone, including his mother's telephone number and one of Maldonado's purported drug customers.  (Connolly Aff. ¶ 26).  Special Agent Connolly explained that drug traffickers often attempt to thwart law enforcement by frequently changing and fictitiously registering telephones in order to conceal their identities.  (Connolly Aff. ¶ 8).

Furthermore, Special Agent Connolly believed that TT1 was used to facilitate drug transactions based on calls from other telephones to TT1 which were being monitored by law enforcement agents.  (Connolly Aff. ¶¶ 27–29).  During such

10

interceptions, law enforcement officers monitored what they believed to be coded messages to disguise discussion of drug transactions. (Connolly Aff. ¶¶ 27-29). In one such conversation, in January 2011, an unidentified male told Maldonado that he was with a friend, the friend wanted Maldonado to be patient, and "the friend" should "complete that tomorrow." (Connolly Aff. ¶ 28). Special Agent Connolly believes "the friend" was a drug customer who wanted Maldonado to be patient because he should have all the drug proceeds to give to Maldonado on the next day. (Connolly Aff. ¶ 28).

Similarly, Special Agent Connolly connected drug transaction activity to both Maldonado and Maldonado's use of telephones. In one such call in November 2010 between Maldonado and Pelon, believed to be providing assistance to Maldonado in the distribution of drugs, Maldonado told Pelon to go get "the other one," "to pick some tortillas up" because Maldonado needed some, and reiterated to Pelon that he needed go right then. Special Agent Connolly deciphers the call to mean that Maldonado told Pelon to go over to the drug stash house ("the other one") and Berna, a drug trafficker who purchases drugs from Maldonado, would meet him at the stash house to pick up an unknown quantity of drugs ("pick some tortillas up"). (Connolly Aff. ¶ 30).

Likewise, on the same day, a second call was intercepted between Maldonado and Pelon on TT2 in which Maldonado asked Pelon if he had already went, Pelon affirmed that he had, and Pelon said that he "did everything." Maldonado asked if Berna had arrived, and Pelon stated that he had not. Maldonado asked Pelon if he "already saw it," to which Pelon responded that he "had the tortillas ready but he hadn't arrived yet."

11

Special Agent Connolly believes the translation of Maldonado and Pelon's conversation is that Maldonado inquired if Pelon had already gone to the stash house to prepare drugs for Berna, and Pelon responded that he had done so ("did everything"). Pelon told Maldonado that Berna had not yet arrived to pick up the drugs ("had the tortillas ready, but he has not arrived yet"). (Connolly Aff. ¶ 31).

On the same day, a third call between Maldonado and Pelon was intercepted on TT2 whereby Maldonado asked Pelon what was up, Pelon replied that Berna took a packet of tortillas, and Maldonado thanked Pelon. (Connolly Aff. ¶ 32). Special Agent Connolly attested that this means Pelon was telling Maldonado that Berna picked up the drugs. (Connolly Aff. ¶ 32). Based on the information obtained during the prior interceptions, it was reasonable for the district judge to conclude that there was probable cause to believe that interception of TT1 would yield evidence showing that Maldonado and others conspired together to distribute controlled substances, an enumerated offense for which a wiretap order may be obtained. See 18 U.S.C. § 2516(1)(e).

### B.   Probable Cause for Interception of Target Telephones 3-5

Defendant contends that evidence obtained from the interception of telephone calls he had with target telephones three ("TT3") through five ("TT5") should be suppressed because although Defendant was named as an interceptee of target telephones TT3 through TT5,[3] law enforcement failed to provide a single fact to support interception of his telephone communications. Additionally, Defendant argues the

_____

[3] While Defendant was named as an interceptee, his telephone was not a target telephone. (Ex. B, App., pp. 2-3).

12

unlawful interception of a telephone call between him and Maldonado, which was authorized by Judge Batten's March 7, 2011 Order authorizing interception of TT3 through TT5, supplied the evidence upon which law enforcement officers relied in order to obtain the April 1, 2011 Order allowing the wiretap on Defendant's phone ("TT7"), and therefore evidence obtained from the interception of TT7 should be suppressed as fruit of the poisonous tree.

The Eleventh Circuit, however, has already concluded that the Government does not have a duty to establish probable cause as to the interception of calls involving each possible interceptee named in an application for a wiretap order; the Government need only establish that there was probable cause that the telephone in question is being used in an illegal operation.  United States v. Domme, 753 F.2d 950, 954 (11th Cir. 1985); see also United States v. Nunez, 877 F.2d 1470, 1473 n.1 (10th Cir. 1989); United States v. Degaule, 797 F. Supp. 2d 1332, 1355 (N.D. Ga. 2011); cf. United States v. Kahn, 415 U.S. 143, 152-53 (1974) (holding that under 18 U.S.C. § 2518(1)(b)(iv) and 2518(4)(a), "when there is probable cause to believe that a particular telephone is being used to commit an offense, but no particular person is identifiable, a wire interception order may nevertheless, properly issue under the statute" and that "it necessarily follows that Congress could not have intended that the authority to intercept must be limited to those conversations between a party named in the order and others, since at least in some cases, the order might not name any specific party at all").

Thus, contrary to Defendant's view, the Eleventh Circuit has already concluded

AO 72A
(Rev.8/82)

that law enforcement did not have to specifically provide probable cause for the interception of Defendant Najera-Perez's communications within the application for authorization of interception of TT3 through TT5.  Connolly's Affidavit only needed to provide probable cause that TT3, TT4, and TT5 were being used for an illegal operation.

Under the facts of this case, Special Agent Connolly's Affidavit provided probable cause that TT3, TT4, and TT5 were being used in connection with an illegal operation.  First, evidence obtained from prior interceptions of coded conversations from Maldonado's telephones linked drug trafficking activity to Maldonado.  Special Agent Connolly attested that although Maldonado used coded messages to accomplish drug transactions, based on the training and experience he and other agents have, they have been able to discern that a number of previously intercepted telephone conversations shows that Maldonado was involved in trafficking drugs.  (Connolly 2 Aff. ¶¶ 21-23).  For instance, based on a intercepted conversation in which Maldonado advised an individual in Mexico that "the cubes were at fourteen," agents could discern that Maldonado was distributing crystal methamphetamine (known as ice or cubes) and that he was telling the individual that the price for a pound of crystal methamphetamine is $14,000.  (Connolly Aff. ¶ 21).  Additionally, based on calls intercepted on TT1 during February 2011, agents were able to seize marijuana from Maldonado's customer after watching the customer pull into Maldonado's driveway and depart several minutes later.  (Connolly Aff. ¶ 22).

The Affiant also presented information connecting TT3, believed to be used by

14

Borrego, to Maldonado and criminal activity. (Connolly Aff. ¶ 23). During phone calls intercepted on TT1 between Borrego and Maldonado, Borrego asked if Maldonado was interested in purchasing drugs from him in coded language. (Connolly Aff. ¶ 23). Based on such conversations, the agents observed that the calls were in an "exceptionally coded language," which both individuals used to communicate and understood each other very clearly, leading agents to believe that the two had a close business and personal relationship. (Connolly Aff. ¶ 23). Special Agent Connolly's Affidavit further stated that on February 12, 2011, Maldonado was intercepted over TT1 speaking with Borrego over TT3 about Borrego's source of supply. Id. at 15 ¶¶ 24, 25. Specifically, Borrego told Maldonado that according to "the guy," the driver was not answering his calls and that he might be "sick or in the hospital" because "the guy" said he "always calls him and always checks in." Id. at ¶ 24. Special Agent Connolly concluded--based on information and experience--that during this call, Borrego was telling Maldonado that he was worried that his source of supply might have been arrested because he was not answering his phone calls. Id.

In addition, on February 8, 2011, during a call between Borrego and Maldonado, Borrego told Maldonado that he went to bring the "tacuache" (meaning motor vehicle) he plays with (the one used to transport drugs) to get it fixed. (Connolly 2 Aff. ¶ 25). Maldonado responded that he would like to have taken his car so that the "botana" could be installed differently (meaning that the mechanic could have installed the hidden compartment in his car differently). Moreover, agents believe that TT3 has been used

15

to contact Quinni, who agents believed based on prior intercepted calls between Maldonado and Quinni to be a drug courier, and an unidentified male known as "La Comba," who agents believed to be a drug trafficker based on prior intercepted calls between La Comba and Maldonado. (Connolly 2 Aff. ¶ 26). Based on this information, Special Agent Connolly believed that Borrego was engaging in drug trafficking activities over TT3.

Additionally, an unidentified female known as Lidia has been connected to drug activity, Maldonado, and TT4. At one point, during an intercepted call between Maldonado, who was using TT1, and Lidia, who was using TT4, agents overheard Maldonado instructing Lidia "to grab his socks," head over to where the "one is from down there," and get "his toys so he can have fun." (Connolly 2 Aff. ¶ 28). Maldonado also told Lidia that he thought he was done. (Connolly 2 Aff. ¶ 28). Special Agent Connolly deciphers the conversation to mean that Maldonado told Lidia to grab his personal things from their house and all of the drug proceeds stored at Maldonado's residence ("his toys so he can have fun") and go to a friend's house where it is safe (head over to "where the one is from down there") because he was fearful that law enforcement were going to search his residence. (Connolly 2 Aff. ¶ 28). Connolly also believes that based on Maldonado's comment that he thought he was done, Maldonado was telling Lidia that he believed one of his drug customers had been arrested. (Connolly 2 Aff. ¶ 28). Toll analysis of TT4 also reveals that TT4 has been in contact with Quinni on approximately 123 occasions, Pelon, who agents believe to be a drug

16

trafficker, on 69 occasions, and Pedro Hernandez, who based on previous intercepted calls is believed to be a drug trafficker.  (Connolly 2 Aff. ¶¶ 29-31).

Agents believe that TT5 is used by Maldonado and linked to drug activity. Special Agent Connolly believes that after agents seized approximately 166 pounds of marijuana from Maldonado's drug customer on February 14, 2011, Maldonado stopped using TT1 and began using TT5.  (Connolly 2 Aff. ¶ 32).  Special Agent Connolly requested toll information for TT1's most frequently called telephone numbers and discovered that on February 14, 2011, all of the telephone numbers that were used to frequently call TT1, were no longer calling TT1 and instead were used to call TT5. (Connolly 2 Aff. ¶ 32).  Agents also learned that TT5 has been in contact with TT3, believed to be used by Borrego, another telephone number believed to be used by Pedro Hernandez, a suspected drug trafficker, Maldonado's neighbor, two unidentified males believed to be drug traffickers based on an interpretation of coded messages previously intercepted over TT1, and a telephone number used by Maldonado's mother in Mexico. (Connolly 2 Aff. ¶¶  33-36).  Based on the information obtained during the prior interceptions, it was reasonable for the district judge to conclude that there was probable cause to believe that interception of TT3, TT4, and TT5 would yield evidence showing that Maldonado and others conspired together to distribute controlled substances, an enumerated offense for which a wiretap order may be obtained.  18 U.S.C. § 2516(1)(e).

C.   **Probable Cause Supported the April 1, 2011 Wiretap**

Defendant makes a multitude of challenges as to whether the Affidavit in support

17

of the April 1, 2011 wiretap application supplies probable cause.  Defendant contends that the April 1, 2011 wiretap application was not supported by probable cause because (1) interception of phone calls between Jose Hernandez Bueno, who was arrested, and Maldonado did not provide probable cause because the Affidavit provided no information about whether their communications were innocent or criminal in nature and did not identify the charges against Hernandez-Bueno; (2) the Affidavit did not connect any criminal activity to Defendant, and the only information which supported interception of Defendant's phones was obtained during the illegal wiretap of TT5 on March 7, 2011; (3) the Affidavit attempted to connect Defendant to Maldonado, however, there was no information corroborating that conversations between Defendant and Maldonado were criminal in nature, there was no evidence showing that they met around the alleged dates of phone calls to conduct drug transactions, and there was no information that they frequently called each other; (4) information from confidential sources did not provide probable cause because there was no indication that the sources were reliable and credible, the information they supplied was not corroborated, there were omissions in the information they provided, and the information they provided was double hearsay; (5) although Special Agent Connolly relied upon toll records to learn that TT7 was used to contact a telephone number in Mexico 257 times, Special Agent Connolly did not name the city in Mexico for the location of the phone or the organization; and (6) undated information within the Affidavit was stale.

In this case, ample information within Special Agent Connolly's Affidavit

connects Defendant to Maldonado and unlawful distribution of controlled substances. Even if the Court were to disregard information older than three months old, information from intercepted calls between Hernandez-Bueno and Maldonado, information from the confidential informants, and the toll records indicating that Defendant contacted Mexico 257 times. First, in February 2011, agents seized approximately 166 pounds of marijuana from an individual they believed to be Maldonado's customer after the individual backed out of Maldonado's driveway. (Connolly 3 Aff. ¶ 22). Additionally, intercepted calls connected Maldonado to drug activity and Defendant to Maldonado. For example, in an intercepted call between Maldonado and Quinni on March 26, 2011, Maldonado asked Quinni if Quinni remembered the guy that Quinni met at the store the previous day, added that the guy went to the study, and advised Quinni that the man "knew about over there." (Connolly 3 Aff. ¶ 26). In response, Quinni asked Maldonado if Maldonado wanted Quinni to "go and get that." (Connolly 3 Aff. ¶ 26). Maldonado replied that he wanted Quinni to "transport it" and to see if a third party could help him out with a "couple of days over there." (Connolly 3 Aff. ¶ 26). Special Agent Connolly's translation of the conversation is that Maldonado told Quinni that a drug customer was arrested ("went to the study") and that the drug customer knew the location of Maldonado's stash house ("knew about over there"), and instructed Quinni that he wanted Quinni to remove the drugs ("get that") from the stash house and store the drugs at a third party's house ("help him out with a couple of days over there"). (Connolly 3 Aff. ¶ 26). Furthermore, based on another call intercepted on March 21,

19

2011, between Maldonado and Lando, Lando asked Maldonado if they (meaning the drugs) were "dientonas" (meaning crystal methamphetamine in large shard pieces), and Maldonado affirmed that they were and that they were all mixed up (meaning there were some large shards and some small shards). (Connolly 3 Aff. ¶ 36).

In addition, intercepted conversations between Maldonado and Defendant provided information that Maldonado and Defendant were involved in drug transactions together. Intercepted calls from TT5 tend to show that Maldonado and Defendant discussed a drug transaction. On March 13, 2011, after Maldonado unsuccessfully attempted to contact an unidentified male believed to be a drug courier several times, Maldonado phoned Defendant and told him that he tried to contact the drug courier, but he did not answer. (Connolly 3 Aff. ¶ 32). Maldonado then told Defendant that "he needs something for tomorrow," that he needed "one or two," and that he needed it delivered that night. (Connolly Aff. ¶ 24). Defendant responded to Maldonado, "no, three," and then told Maldonado it is "for sure." (Connolly 3 Aff. ¶ 24). Based on this conversation, Special Agent Connolly translates that Maldonado advised Defendant that he needed one or two units of drugs, and Defendant responded that he should instead take three units of drugs and that the transaction was a sure thing. (Connolly 3 Aff. ¶ 24). Subsequently, Maldonado received a call from the courier in which the courier advised Maldonado that his "other one" (meaning his other cell phone) was not working well, so he was calling from a different number. (Connolly 3 Aff. ¶ 32). Maldonado told the courier that he just spoke with "his boss" (meaning Defendant) to see if they

20

"could play together" (meaning set up a drug transaction"). (Connolly 3 Aff. ¶ 32).

Maldonado advised the courier that Defendant and the SOS might throw in "whole

ones" (meaning he could provide Maldonado with kilogram quantities). (Connolly 3

Aff. ¶ 32). Thus, not only does information within Special Agent Connolly's Affidavit

link Defendant to Maldonado, who is linked to unlawful drug activity, but also,

information within the Affidavit directly links Defendant to the distribution of unlawful

controlled substances.

This Court also disagrees with Defendant's argument that information gained

from the coded conversation between Maldonado and Defendant should be disregarded

because there was no corroboration that their conversation was criminal in nature.  In

this case, it was proper for the district judge to rely on Special Agent Connolly's

interpretation of the coded messages in determining the existence of probable cause.

The Eleventh Circuit has concluded that the opinions and conclusions of experienced

agents regarding a set of facts is properly a factor in the probable cause equation.

United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995).  In that vein, courts

considering wiretap applications are allowed to rely upon experienced law enforcement

agents' reasonable interpretations of coded conversations used by persons engaged in

allegedly conspiratorial communications. United States v. Dooley, No. 1:11-CR-255-3-

TWT, 2013 WL 2548969, at *21 (N.D. Ga. June 10, 2013); United States v. Flores,

1:05-CR-558-WSD-JFK, 2007 WL 2904109, at *24 n.16 (N.D. Ga. Sept. 27, 2007) ("If

a jury can properly consider this evidence, a District Judge may certainly take it into

21

consideration in determining whether probable cause exists to authorize communication intercepts."); see also United States v. Jayyousi, 657 F.3d 1085, 1102-03 (11th Cir. 2011) (agreeing that district court properly allowed agent to testify at trial as to the meaning of code words during intercepted conversations); Novaton, 271 F.3d at 1009 (same). Furthermore, as discussed above, the fact that much of the information Special Agent Connolly relied upon to obtain the Order permitting the continued interception of Maldonado's calls on TT5 was obtained as a result of prior interception of TT5 is of no consequence because probable cause supported the March 7, 2011 Order allowing the interception of TT5.

### D. The April 28, 2011 Wiretap and Defendant's Arrest

Defendant argues that evidence obtained from the wiretaps of target telephones ten through twenty-seven should be suppressed as fruit of the poisonous tree because the Government relied upon information obtained as a result of the wiretap of Defendant's telephone authorized on April 1, 2011. Defendant contends that the warrant for his arrest was defective as fruit of the poisonous tree because it was based on illegal wiretap orders for target telephones one through twenty-seven. As discussed above, because the April 1, 2011 Order allowing interception of Defendant's telephone was supported by probable cause, information obtained during those interceptions could properly supply probable cause for the interceptions of target telephones ten through twenty-seven.

22

**E.**     **Interception of Geolocation Data**

Defendant argues the geolocation data obtained for the target telephones should be suppressed because the Government did not present probable cause for use of the geolocation data.  In response, the Government contends that the same information that establishes probable cause justifying the wiretaps also supports the position that monitoring geolocation data stored on the target telephones would lead to evidence of violations of the subject offenses.  Even assuming that prospective access to the geolocation data from the target telephones constituted a search for the purposes of the Fourth Amendment, Defendant's argument fails because as discussed above, the Affidavits supplied by the Government present ample probable cause that geolocation data from the target telephones would yield evidence of criminal activity.

**F.**     **Necessity Under 18 U.S.C. § 2518(3)(c)**

1.     The April 1, 2011 Wiretap Order

Defendant argues the Government failed to show that the wiretap of his telephone authorized on April 1, 2011, was a necessity as required by 18 U.S.C. § 2518(3)(c). Specifically, Defendant contends law enforcement agents did not need to intercept his calls on TT7 because they already had a wiretap for TT5 from which they could intercept the calls between Defendant and Maldonado.  Defendant also argues the Government's investigative objectives were so broad and vaguely described that the affiant failed to show how they were attainable, failed to show how investigative goals would be met by wiretaps, there was no foreseeable end to the investigation, and the

23

wiretap orders permitted wide-sweeping surveillance.

Title III permits a district judge to authorize a federal wiretap only when he or she determines, on the basis of the facts submitted by the applicant, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This "necessity requirement" of 18 U.S.C. § 2518(3)(c) "is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." United States v. Miller, 431 F. App'x 847, 853 (11th Cir. 2011); United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986). Therefore, an application for an order authorizing the interception of wire communications must give a full and complete statement as to whether or not other investigative procedures have been tried and failed and whether they reasonably appear to be unlikely to succeed if tried or to be too dangerous. United States v. Carrazana, 921 F.2d 1557, 1564-65 (11th Cir. 1991). "The affidavit in support of a search warrant must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. However, a comprehensive exhausting of all possible investigative techniques is not necessary before applying for a wiretap." Miller, 431 F. App'x 847, 853 (11th Cir. 2011); United States v. De La Cruz Suarez, 601 F.3d 1202, 1214 (11th Cir. 2010); United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984). The district court's determination of necessity is a finding of fact that will not be reversed unless "clearly erroneous," see United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987),

24

and the judge to whom the application is made "is clothed with broad discretion in its consideration of the application." <u>Alonso</u>, 740 F.2d at 868-69.

This Court is not persuaded by Defendant's argument that law enforcement agents failed to demonstrate necessity for the wiretap authorizations.  In this case, Special Agent Connolly's Affidavits more than meet the requirements of 18 U.S.C. § 2518(3)(c).  Special Agent Connolly's Affidavits meticulously explore a wide range of potential investigatory methods and explain why other investigatory methods have already failed, will fall short of accomplishing the goals of the investigation, or are too dangerous to pursue.  (Connolly Aff. ¶¶ 35-70; Connolly 2 Aff. ¶¶ 37-75; Connolly 3 Aff. ¶¶ 39-84)  Moreover, the fact that Special Agent Connolly had already obtained an Order to intercept calls on TT5 did not make interception of Defendant's calls on TT7 unnecessary.  While listening to Maldonado's conversations may provide insight to Defendant and Maldonado's alleged illegal activity they conducted together, the goal of the investigation extended beyond obtaining sufficient information to prosecute Defendant and Maldonado.  Special Agent Connolly attested that the goals of the investigation included discovering the methods of importing and transporting narcotics from Mexico through Texas and/or California to Atlanta, as well as discovering Mexican sources of supply, local distributors, and transportation operatives.  (Connolly Aff. ¶ 41)  Listening to Defendant's conversations might not only clue agents in to Maldonado's and Defendant's illegal activities together, but also the methods by which they were importing and transporting narcotics from Mexico, Mexican sources of supply

25

of methamphetamine, and transportation operatives, each of which were goals of the investigation. Consistent with the recorded conversation allegedly between Maldonado on TT5 and Defendant on TT7, Special Agent Connolly believed Defendant to be coordinating shipments of crystal methamphetamine from Mexico into the Atlanta, Georgia area and then selling crystal methamphetamine in pound quantities. (Connolly 3 Aff. ¶¶ 23, 24). Based on Special Agent Connolly's interpretation, Maldonado told Defendant on March 13, 2011, that he needed one or two units of drugs for the next day and Defendant told Maldonado if he would take three units of drugs instead, that the deal would be a sure thing. Thus, a reasonable inference drawn from this conversation is that Defendant either supplied or assisted in supplying drugs for distribution. In addition, consistent with the information from recorded conversations, information provided by confidential informants, and Special Agent Connolly's belief that Defendant was coordinating shipments of crystal methamphetamine from Mexico into the metro-Atlanta area, between March 11 and March 21, 2011, TT7, believed to be used by Defendant, was in contact with a Mexico based telephone number approximately 257 times. (Connolly 3 Aff. ¶¶ 33, 50). Thus, it is reasonable to infer that intercepting the calls to Defendant, as opposed to Maldonado's calls, might lead to the discovery of information about the methods of importing and transporting narcotics from Mexico, Mexican sources of supply of methamphetamine, and transportation operatives.

Defendant's argument that the Government's investigative objectives were too

26

broad is also unavailing.  Admittedly, the scope of the investigation was wide.  Law enforcement agents sought to discover: (1) the identities of all of the individuals in the drug trafficking organization; (2) the current locations of the target subjects and their unidentified accomplices; (3) the present operations and scope of the drug trafficking activities of the organization in Atlanta and elsewhere; (4) the methods of importing and transporting narcotics from Mexico through Texas and/or California to Atlanta; (5) the methods of disposing of the bulk currency proceeds of drug trafficking and of laundering money to transport to Mexico drug proceeds earned by operatives in the United States; (6) the current significant customers of the organization in Atlanta and elsewhere, Mexican sources of supply, local distributors, and transportation operatives; (7) the locations where members of the organization store their narcotics and/or drug proceeds; and (8) dismantling the organization by convicting the highest level supervisors and leaders and seizing the assets of the organization and its members. (Connolly 3 Aff. ¶ 41).  Defendant, however, provides no authority for the proposition that a broad investigation with ambitious goals is unacceptable under the Wiretap Act.  Moreover, this Court has not located any legal authority from the Eleventh Circuit disallowing a broad investigative goal under the Wiretap Act.  Instead, courts within the Eleventh Circuit have upheld wiretaps as a necessity when there was a broad investigative scope.  See, e.g., Miller, 431 F. App'x at 853 (affirming denial of motion to suppress evidence obtained from wiretap where the "investigation sought to penetrate the drug activity and determine its entire scope, including source of supply,

27

transportation routes, stash houses, and assets purchased as well as the participants' identities" and concluding that "[g]iven the broad scope of the investigation, the affidavit adequately established the necessity for the wiretap."); United States v. Ferrer, No. CR411-200, 2012 WL 1255243, at *5 (S.D. Ga. Feb. 2, 2012) ("It is the Government who sets the scope of its investigation and the Government's agents can cast a wide investigatory net, hoping to learn the full extent of a conspiracy.").

Because the investigation was so broad, Defendant also argues the interception of target telephones would technically never terminate upon the attainment of the authorized objective as required in 18 U.S.C. § 2518(5). Section 2518(5), however, provides only that "[n]o order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5). The Order allowing interception of TT7 satisfies this requirement because it restricted interception to a thirty day period. (Ex. C, April 1, 2011 Order, pp. 8-11).

Defendant further argues the wiretaps were not necessary because law enforcement officers achieved success in their investigation without the use of wiretaps. In support Defendant contends that law enforcement officers (1) identified the suspects' residences by using physical surveillance; (2) could have learned more about locations through the use of pole cameras; and (3) had success using confidential informants. As Special Agent Connolly points out, however, physical surveillance and pole cameras are

28

likely to be unsuccessful in achieving the larger goals of the investigation because surveillance and pole cameras only provide agents with limited visual footage of people arriving and departing from identified residences without audio recordings. (Connolly 3 Aff. ¶¶ 64, 79). Special Agent Connolly further explained that visual surveillance and pole cameras will miss evidence of illegal activity because visitors to the residences inclined to engage in illegal activity will do so inside the residences instead of outside the residence where they can be seen. (Connolly 3 Aff. ¶¶ 64, 79). In addition, Special Agent Connolly explained that installation of the pole cameras is not feasible because they are installed on electricity poles and the residences are in secluded areas where installation of a pole camera would draw suspicion. (Connolly 3 Aff. ¶ 79). Similarly, given that the drug trafficking organization actively conducts counter-surveillance, visual surveillance may alert the drug trafficking organization to the presence of law enforcement. (Connolly 3 Aff. ¶¶ 73-75).

Defendant's contention that wiretaps were unnecessary because law enforcement could have used informants to attain their investigative objectives through the use of consensual monitoring is also unavailing. In support, Defendant contends that CS-1 and CS-2 must have been trusted family members or close friends with knowledge of intimate details about him because they were able to provide information about his plans to obtain a warehouse to store drugs, were able to give details regarding his efforts to educate himself about setting up a truck company to ship drugs directly from Mexico to Atlanta, as well as provide agents with his phone numbers, habits, intentions and

associates. Contrary to Defendant's argument, however, Special Agent Connolly adequately explained why use of confidential informants would not achieve the goals of the investigation. Special Agent Connolly explained that both informants were limited only to information that Defendant provided for them. (Connolly 3 Aff. ¶¶ 50-51). Special Agent Connolly further explained that people who work for large-scale drug organizations usually perform discrete, compartmentalized tasks and are intentionally kept unaware of all the other members of the organization and their specific roles within the organization. (Connolly 3 Aff. ¶ 54). According to Special Agent Connolly, members of a drug trafficking organization are often unwilling to discuss the structure and operation of the organization with lower level members and that it is doubtful that he could timely develop any cooperating individuals who have access to the higher levels of the drug trafficking organization. (Connolly 3 Aff. ¶ 54). Additionally, Special Agent Connolly believed that the drug trafficking organization is one large extended family from Mexico and that if agents confronted a family member who was involved with the drug trafficking organization, it would be extremely likely that the family member would alert the rest of the drug trafficking organization. (Connolly 3 Aff. ¶ 54).

Furthermore, Special Agent Connolly explained that more cannot be obtained from confidential informants through consensual monitoring because drug trafficking organizations are typically reluctant to discuss their co-conspirators, their roles within the organization, or the location of stash houses, and therefore, it is unlikely that the

AO 72A
(Rev.8/82)

target subjects would engage in significant or detailed conversations with a cooperating source.  (Connolly 3 Aff. ¶ 76).  Thus, the use of confidential informants could not accomplish the investigation's larger goals of identifying and convicting the organization's highest level supervisors and leaders.  Accordingly, Special Agent Connolly adequately explained why use of confidential informants did not obviate the need for the wiretaps.  See, e.g., Sills v. United States, 395 F. App'x 570, 573 (11th Cir. 2010) (finding necessity for wiretap where confidential informants had no information on the conspiracy's inner workings and that the drug organization was comprised of a close-knit group of individuals unlikely to trust undercover agents); United States v. Allen, 274 F. App'x 811, 816 (11th Cir. 2008) (noting that nothing within the law requires that traditional methods of investigation be entirely useless before issuance of a wiretap); United States v. Messersmith, 692 F.2d 1315, 1317-18 (11th Cir. 1982) (rejecting argument that cooperation of informant negated need for wiretap); United States v. Chaidez-Ontiveros, No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, at *9 (N.D. Ga. Oct. 25, 2011) (concluding that successful use of informants does not preclude use of wiretaps).

>    2.    The February 4, 2011 Order

In Defendant's May 7, 2013 brief, Defendant also argues Special Agent Connolly's February 3, 2011 Affidavit did not establish necessity for the wiretap Order issued on that date because it relied on boilerplate statements as to why surveillance with other forms of investigation would not be sufficient.  This Court disagrees.  Special

31

Agent Connolly's Affidavit was not limited to boilerplate statements; it provided information specific to the investigation showing why surveillance would not be effective by itself.  In addition to pointing out obvious limitations to surveillance which could be applicable to many investigations of drug trafficking organizations, Special Agent Connolly said that the drug trafficking organization being investigated was cognizant of law enforcement, performs counter-surveillance, and chose residences that are difficult for law enforcement to watch and difficult for law enforcement to install pole cameras.  (Connolly Aff. ¶¶ 57-58, 62, 64-65, 69).  Special Agent Connolly explained that the locations the agents would observe are situated such that agents cannot discreetly set up surveillance.  (Connolly Aff. ¶ 62).

Defendant also contends that the fact that Special Agent Connolly reported some limited success with surveillance and use of pole cameras means that wiretaps were not a necessity in this investigation.  As discussed above, the partial success of alternative investigative measures does not necessarily render electronic surveillance unnecessary.  United States v. Perez, 661 F.3d 568, 582 (11th Cir. 2011).  In this case, Special Agent Connolly's Affidavit details why the wiretaps were still a necessity despite the limited success of other investigatory methods.  Therein, Special Agent Connolly explains that agents had not been able to ascertain the capacity in which the drug trafficking organization uses four residences associated with the targets of the investigation, to discern the reasons people arrive and depart from the properties, or to observe drug transactions which might have been done covertly inside the residences.  (Connolly Aff.

32

¶¶ 57-60, 69).  Special Agent Connolly also explained that surveillance also falls short as an investigative method because without the interception of communications, agents do not have the means to anticipate when a transaction would occur and if agents were close enough to hear communications, they would be detected.  (Connolly Aff. ¶ 63). More importantly, Special Agent Connolly noted that because drug traffickers use lower level members of the organization to process, store, and distribute drugs, and to collect the  drug proceeds, surveillance of specific isolated meetings will not necessarily result in identification of supervisory or managerial members of an organization.  (Connolly Aff. ¶ 61).

Furthermore, Special Agent Connolly adequately detailed why use of pole cameras could not achieve the goals of the investigation without interception of wire communications.  Special Agent Connolly stated that despite installing a pole camera at Maldonado's residence, the agents did not gain any worthwhile intelligence from it. (Connolly Aff. ¶ 69).  Special Agent Connolly also explained that pole cameras are typically installed on electricity poles but because the residences targeted in this case were located in secluded areas, the installation of pole cameras, in certain instances, was not possible because there were no poles.  (Connolly Aff. ¶ 69).  Although as Defendant points out, agents did subsequently install a pole camera at some other residences not identified in the Affidavit, Defendant falls short of explaining why the subsequent installation of additional pole cameras at other unrelated residences obviated the need for the wiretap.  As Special Agent Connolly explained and Defendant does not

33

dispute, because pole cameras do not provide interception of oral communications, agents would not be able to fully understand the purposes of visits by others to the residences.  (Connolly Aff. ¶ 69).

### G.    Identity of Individuals Whose Calls may be Intercepted

Defendant contends that the Wiretap Orders are each invalid on their face because they fail to specify the individuals whose calls may be intercepted.  Under 18 U.S.C. § 2518(4), each order authorizing the interception of wire, oral, or electronic communications must specify the identity of the person, if known, whose communications are to be intercepted.  18 U.S.C. § 2518(4)(a).  As the Government points out, however, the wiretap orders do identify the individuals whose wire communications would be intercepted.  (Order, Ex. A, p. 3; Order, Ex. B, pp. 3-4; Order, Ex. C, p. 4).  Defendant makes no argument that other individuals were known to the investigation to be committing the offense, but not identified within the Orders.  See United States v. Kahn, 415 U.S. 143, 152-53 (1974) (explaining that the statutory language of 18 U.S.C. § 2518(4)(a) requires only that a specific person be named in the wiretap application when law enforcement officials believe that such an individual is known to the Government to be committing one of the offenses specified in 18 U.S.C. § 2516); United States v. Killingsworth, 117 F.3d 1159, 1165 (10th Cir. 1997).

### H.    Minimization

Defendant further contends that law enforcement agents failed to comply with the minimization requirement in 18 U.S.C. § 2518(5) when law enforcement failed to

34

minimize non-pertinent calls as a whole.  Under 18 U.S.C. § 2518(5), electronic surveillance must be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.  18 U.S.C. § 2518(5); United States v. De La Cruz Suarez, 601 F.3d 1202, 1214-15 (11th Cir. 2010).  Section 2518(5) does not forbid the interception of all nonrelevant conversations, but rather instructs law enforcement to conduct the surveillance in such a manner as to minimize the interception of such conversations.  Scott v. United States, 436 U.S. 128, 140 (1978). When reviewing a challenge to the government's minimization efforts, courts are required to make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time.  United States v. Gonzalez Perez, 283 F. App'x 716, 722 (11th Cir. 2008).  The standard to be applied when analyzing the Government's action is reasonableness.  Van Horn, 789 F.2d at 1501.

In this case, however, the Affidavits presented by Special Agent Connolly show that procedures were put in place to minimize the interception of irrelevant calls to and from the Target telephones.  Specifically, Special Agent Connolly explains that: (1) interceptions of wire communications will be suspended immediately when it is determined that the target subjects are not participants in the conversation; (2) agents will monitor all wire communication to determine if a party to a conversation is a member of the drug trafficking organization, but monitoring will be discontinued if agents determine that the conversation does not involve the target subjects or is not criminal in nature; and (3) special attention will be given to minimize any privileged

35

conversations.  See , e.g. (Ex. A Aff. at 35 ¶¶ 75-80;  Ex. B Aff. at 45 ¶¶ 80-85; and Ex. C Aff. at 51 ¶¶ 85-90).  Defendant presents no specific argument as to how under the facts and circumstances of this case, Government agents failed to minimize interception of irrelevant calls.  Defendants bear the burden of showing some illegality in order to justify suppression of wiretap evidence.  United States v. Giacalone, 853 F.2d 470, 482 (6th Cir. 1988) (holding that the burden of production and persuasion rest on person seeking to suppress wiretap evidence on the basis of improper minimization and that defendant was not entitled to a hearing on the issue); United States v. Cantu, 625 F. Supp. 656, 675 n.36 (N.D. Fla. 1985); but see United States v. Rizzo, 491 F.2d 215, 217 n.7 (2d Cir. 1974) (holding that Government has burden of proof on minimization issue); cf. United States v. De La Fuente, 548 F.2d 528, 534-35 (5th Cir. 1977) (finding that Defendant bore burden of making some initial showing that signature on wiretap authorization which appeared entirely regular on its face and supported by other facially regular documents was inauthentic or that there was a likelihood that someone other than the attorney general himself had approved authorization to apply for wiretap); see also Novaton, 271 F.3d at 986-987 (concluding that in order to suppress evidence obtained using a wiretap, a defendant must carry his burden of proving that (1) the affiant knowingly or recklessly made alleged misrepresentations or omissions, and (2) exclusion of alleged misrepresentations or inclusion of alleged omissions would have been a lack of probable cause for issuance of the warrant).  Without some showing on Defendant's part, this Court cannot conclude that the Government did not minimize its

interception of non-pertinent calls or that a hearing should be held to require the Government to prove that it properly minimized interception of irrelevant calls. Giacalone, 853 F.2d at 483; De La Fuente, 548 F.2d at 534-35; United States v. Gordon, No. 11-CR-20752, 2013 WL 461780, at *7-8 (E.D. Mich. Feb. 7, 2013).

### I.    **Description of Communications to be Intercepted**

Defendant contends that the applications for the wiretaps and the Orders authorizing them are insufficient on their face because they fail to provide a sufficiently particular description of the type of communication sought to be intercepted in violation of 18 U.S.C. §§ 2518(1)(b)(iii) and 2518(4)(c) Defendant, however, does not provide any hint as to how the descriptions within the applications and Orders were deficient. Issues raised in a perfunctory manner, without supporting arguments and citations to authorities, are generally deemed to be waived.  United States v. Langford, 647 F.3d 1309, 1331 (11th Cir. 2011).  Moreover, this Court has not located any defect within the descriptions of the applications and Orders.  Pursuant to 18 U.S.C. §§ 2518(1)(b)(iii) and 2518(4)(c), every application for an order and every order authorizing the interception of wire, oral, or electronic communications shall include a particular description of the type of communications sought to be intercepted.  Additionally, 18 U.S.C. § 2518(4)(c) requires that every order include "a statement of the particular offense to which it relates."  18 U.S.C. § 2518(4)(c).  Courts have concluded that the description is sufficient where the order or application lists the phone numbers to be intercepted, indicates interception of the communications to and from the numbers will

37

concern drug offenses, and lists the specific offenses suspected.  <u>United States v. Williams</u>, 45 F.3d 1481, 1485 (10th Cir. 1995); <u>United States v. Samuels</u>, 436 F. Supp. 2d 280, 285 (D. Mass. 2006).  In this case, the applications and Orders adequately describe the type of communications to be intercepted.  The applications and Orders included a list of individuals from whom wire communications would be intercepted, a list of telephone numbers to be intercepted, and a list of offenses which were the subject of communications to be intercepted.  <u>See, e.g.</u>, Application, Ex. A, ¶ 2; Order, Ex. A, pp. 1-6; Application, Ex. B, ¶ 2; Order, Ex. B, pp. 1-7; Application, Ex. C, ¶ 2; Order, Ex. C, pp. 2-8.

**J.     Authorization for Wiretaps**

Defendant contends  that each of the applications and Orders for wiretaps in this case are defective because they did not clearly identify the person who is claiming to be the designated official who may authorize the wiretap application or indicate to whom the authority to apply for wiretaps has been delegated, as required under 18 U.S.C. § 2518(1)(a).  In support, Defendant relies on the February 3, 2011 wiretap application and Order as an example and points out that the signature line of Lanny A. Breuer, Assistant Attorney General, on the Authorization for Interception Order Application, is not signed.  Defendant claims that other applications for wiretaps suffer from the same defect.

**1.     The Application was not Defective**

The February 3, 2011 application for the order for the wiretap adequately

38

indicates individuals to whom the Attorney General has delegated his authority to authorize a wiretap and indicates who authorized the wiretap approved on February 3, 2011.  Pursuant to 18 U.S.C. § 2518(1)(a), an application for an order authorizing a wiretap must include the identity of the investigative or law enforcement officer making the application and the officer authorizing the application.  Under 18 U.S.C. § 2516(1), any Deputy Assistant Attorney General or Acting Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General may authorize application for interception of wire or oral communications.  The wiretap application in this case evidences proper delegation by the Attorney General of his authority to authorize a wiretap to his Deputy Assistant Attorney Generals and acting Deputy Assistant Attorney Generals in the Criminal Division.   The application includes Attachment A which is the Attorney General's Order of Special Designation and the Memorandum of Authorization approving the application.  (Ex. A, Application, p. 3). Attachment A, which includes an Order signed by the Attorney General, Eric Holder, properly identifies designated officials who may authorize wiretap applications. Attachment A also indicates that any Deputy Assistant Attorney General and acting Deputy Assistant Attorney General of the Criminal Division has the authority to authorize applications for orders authorizing interception of wire communications. (Ex. A, Application, Attachment A).  Consistent with the Attorney General's delegation, a second document within Attachment A entitled Authorization for Interception Order Application authorizes the interception of communications over TT1 and is signed by

39

Mary Brown ("Brown"), a Deputy Assistant Attorney General from the Criminal Division.  Although the memo indicates that it is from Lanny A. Breuer, it is clear that Brown authorized the interception because it is her signature at the bottom of the page authorizing the wiretap.  Additionally, Brown clearly defines who may make the application to the district court as Brown authorizes "any investigative or law enforcement officer of the United States" as defined in Section 18 U.S.C. § 2510(7) to make the application.  Thus, the application was not defective and to the extent that the other wiretap applications followed this format, they too were not defective.

> 2.   Any Defect Within the Order was a Mere Technicality and did not Require Suppression

Defendant also contends that the Orders did not properly set forth the identity of the person authorizing the applications as required by 18 U.S.C. § 2518(4)(d).  Title 18, Section 2518(4)(d) of the United States Code provides that each order authorizing the interception of wire, oral, or electronic communication shall specify the identity of the agency authorized to intercept the communications and the person authorizing the application.  18 U.S.C. § 2518(4)(d).  In this case, the February 2011 Order clearly specifies that the DEA agents are given the authority to intercept communications from the target telephones.  (Ex. A, Order, p. 5).  The Order also provides, however, that the application for the interception of communications was "authorized by an appropriate official of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General under the authority vested in him by Section 2516 of Title 18, United States Code."  (Ex. A, Order,

40

p. 5).  Thus, the official authorizing the application was not specifically named within the Order.

Even if the omission of the specific name of the official authorizing the application was technically a violation of the wiretap statute, however, not every failure to comply with the wiretap statue requires suppression of evidence.  Under 18 U.S.C. § 2518(10)(a), a defendant "may move to suppress the contents of any wire or oral communication intercepted pursuant to [the federal wiretap statute], or evidence derived therefrom, on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."  The United States Supreme Court in interpreting this language has held that although Section 2518(10)(a) allows suppression when a communication is unlawfully intercepted, "not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications unlawful."  United States v. Donovan, 429 U.S. 413, 433-34 (1977); United States v. Chavez, 416 U.S. 562, 574-75 (1974); United States v. Giordano, 416 U.S. 505, 527 (1974).  Suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."  Donovan, 429 U.S. at 433-34, citing Giordano, 416 U.S. at 527.  Where the requirement violated does not play a

central, or even functional role, in guarding against unwarranted use of wiretapping or electronic surveillance, suppression is not required. Donovan, 429 U.S. at 435-36; United States v. Van Horn, 789 F.2d 1492, 1500 (11th Cir. 1986). Under this reasoning, the Courts of Appeal have not suppressed wiretap evidence where the violation of the federal wiretap statute was a mere technicality. United States v. Lomeli, 676 F.3d 734, 739 (8th Cir. 2012) ("Suppression is not justified if the facial insufficiency of the wiretap order is no more than a technical defect."); United States v. Gray, 521 F.3d 514, 523-27 (6th Cir. 2008); United States v. Radcliff, 331 F.3d 1153, 1162-63 (10th Cir. 2003) (reasoning that suppression was not required for failure to name Department of Justice officials who authorized the wiretap applications because mere technical defect in wiretap application did not establish a substantive role to be played in the regulatory system); Van Horn, 789 F.2d at 1500 (holding that inadvertent omission of materials necessary for wiretap application did not require suppression of wiretap evidence). Thus, the mere failure to specifically name the authorizing official at the Department of Justice in the Order does not warrant suppression of the wiretap evidence where the failure is merely a technical defect that does not undermine the purposes of the statute or prejudice the Defendant. United States v. Small, 423 F.3d 1164, 1178 (10th Cir. 2005); see also Gray, 521 F.3d at 526; Radcliff, 331 F.3d at 1161; United States v. Fudge, 325 F.3d 910, 918 (7th Cir. 2003). Where there is no dispute that the applications were authorized by an appropriate individual within the Department of Justice and this authorizing individual was identified by name in the wiretap application,

42

the failure to name the official in the wiretap order does not prejudice the Defendant or undermine the purposes of the wiretap statute.  <u>Small</u>, 423 F.3d at 1178; <u>see also</u> <u>Gray</u>, 521 F.3d at 526-27; <u>Fudge</u>, 325 F.3d at 918.  In this case, Brown was named in attachments which were part of the application, thus the failure to specifically reference Brown's name in the Order does not require suppression.

### DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE SEIZED FROM HIS RESIDENCE AND TRUCK

In Defendant's Motion to Suppress Statements and Evidence Seized From his Residence and Truck, Defendant seeks to suppress statements he made to Federal Bureau of Investigation ("FBI") agents during a search of his residence on August 1, 2012, and evidence seized from his residence and vehicles during that search. Specifically, Defendant contends that statements he made to FBI Special Agent Rafael Jimenez ("Special Agent Jimenez") should be suppressed because Special Agent Jimenez unlawfully interrogated him while he was in custody prior to giving him <u>Miranda</u> warnings.  Defendant alleges Special Agent Jimenez asked him whether the room in which Defendant was found was Defendant's bedroom and whether medicine within the bedroom belonged to Defendant.  In addition, Defendant argues evidence obtained during a search of his residence should be suppressed because he did not knowingly, intelligently, and voluntarily consent to the search.  In support, Defendant argues the circumstances that led to his consent were coercive because agents tried to create a rapport with him prior to seeking his consent when they addressed his potential medical needs and engaged in small talk with him.  Furthermore, Defendant contends

43

that the consent to search form that he signed did not adequately convey that his consent included consent to conduct a search of his vehicles and their compartments. Lastly, Defendant contends that Sergeant Charles Chapeau ("Sergeant Chapeau") of the Georgia State Patrol performed a K-9 search of his residence and his Cadillac Escalade located at his residence, but failed to show that the dog was trained to only alert at the presence of narcotics.

Although Defendant originally contended that a search and seizure of a Ford F-150 pickup truck on July 6, 2011, was unlawful, Defendant subsequently conceded that he did not have standing to contest the search and seizure of the F-150 and withdraws his challenge of the search and seizure of that vehicle. (Compare Docket Entry [74], at pp. 3-4 with Transcript of March 20, 2013 Suppression Hearing, hereinafter "Tr." 3).

## I. BACKGROUND

### A. Special Agent Jimenez Asks Defendant Questions During Defendant's Arrest, but Prior to Giving Miranda Warnings

On or before 6:30 a.m. on August 1, 2012, Special Agent Jimenez, along with a team of ten to twelve other law enforcement officers, entered Defendant's home and arrested him pursuant to an arrest warrant. (Tr. 4-6, 32). After entering the home, Special Agent Jimenez and other officers found Defendant in his bedroom standing next to his bed, cuffed Defendant's hands behind his back, and notified him that he was under arrest. (Tr. 6-7, 11). Defendant was shirtless and wearing pajama bottoms. (Tr. 16). At some point, while sitting Defendant down on the bed and locating clothes for him, Special Agent Jimenez asked Defendant if the bedroom was his. (Tr. 11-12, 16).

44

As Defendant sat on the edge of his bed, Special Agent Jimenez observed pill bottles with Defendant's name on the bottle located on the dresser next to Defendant's bed. (Tr. 7). Special Agent Jimenez asked Defendant in Spanish how he was and the purpose of the pills. (Tr. 7, 11-12, 14). Defendant responded that one pill bottle was for blood pressure and one was for herpes. (Tr. 7). During the course of their interaction, Defendant also explained that he had high blood pressure and low blood sugar, he needed to eat, and he needed to take his blood pressure medication. (Tr. 8, 13). Special Agent Jimenez then asked the SWAT team medic to request the assistance of paramedics. (Tr. 7). Thereafter, Special Agent Jimenez translated the medic's questions to Defendant and Defendant's answers to the medic's questions. (Tr. 7). Special Agent Jimenez explained to Defendant that prior to allowing him to take his blood pressure medication, they needed to know what his blood pressure was and that he was okay. (Tr. 8). At that point, a medic took Defendant's blood pressure. (Tr. 8, 17, 33). During this time, Defendant was making "small jokes" because the first blood pressure cuff did not work properly. (Tr. 9). The medic eventually reported that either Defendant or his blood pressure was okay. (Tr. 8, 17). Based on the medic's recommendation, the agents decided that Defendant did not have to be transported to a hospital or receive further medical treatment and that he was well enough to take his blood pressure medication. (Tr. 17). Defendant was given a glass of water and allowed to ingest a pill from the bottle. (Tr. 8). Another medic gave Defendant a banana for his blood sugar. (Tr. 8). Up until that point, no one had read Defendant his <u>Miranda</u>

45

warnings. (Tr. 8).

### B.   FBI Analyst Maria Pagan Secures Defendant's Consent to Search

Subsequently, the case agents arrived and took Defendant to another room within the residence. (Tr. 10). In the other room, FBI Analyst Maria Pagan ("Analyst Pagan") acted as a translator for the case agents. (Tr. 17). Analyst Pagan, whose native language is Spanish, introduced herself, informed Defendant that she was with the FBI, and explained that she was there to provide some translation so that he could understand what was occurring. (Tr. 21). Analyst Pagan also testified that she tried to build "a little bit of a rapport" with Defendant during that time. (Tr. 19-21). Pagan testified that she did not have any difficulty understanding Defendant and Defendant did not appear to have any difficulty understanding her. (Tr. 21).

Analyst Pagan, while seated in a chair located only a foot in front of Defendant, who was seated on a sofa next to the case agent, Agent Smith, read Defendant an Advice of Rights form in Spanish two times. (Tr. 23-24, 34). The form advised Defendant that: he had the right to remain silent, anything he said could be used against him in court, he had the right to consult with an attorney, he had read the rights, he understood the rights, and he is willing to answer questions and give a declaration without the presence of an attorney. (Tr. 23, Gov't's Exs. 1, 1A). Defendant, who was no longer handcuffed, signed the form. (Tr. 25).

After Defendant signed the document, Analyst Pagan twice read a Consent to Search form to Defendant in Spanish. (Tr. 28). That form provided in Spanish that

Defendant was providing his permission to search the specific things handwritten on the document. According to Analyst Pagan, prior to giving Defendant the form to sign, she wrote on the form that the places and things to be searched included "todos los vehiculos, la residencia, toda en la propriedad, inclugendo todos las cajas, bolsas, y compartimentos en ella."  (Tr. 28, Exs. 2, 2A).  According to Analyst Pagan, the handwritten portion of the form advised Defendant that his consent for the places and things to be searched included "all vehicles, the residence, and everything in the property including all of the boxes, bags, and compartments in it." (Tr. 28, 36). Analyst Pagan testified that the words "en ella" or, translated into English, the words "in it" clearly refers to the residence, because in Spanish "ella" is a female singular pronoun and the residence is a female singular word.  (Tr. 36).  Analyst Pagan indicated that vehicles is a masculine word in Spanish.  (Tr. 36).

Defendant read and signed the document.  (Tr. 28).  At that time, Defendant did not appear troubled or incapacitated, he did not appear ill, and Analyst Pagan did not have any difficulty understanding Defendant's Spanish. (Tr. 29-30).  During this time period, Agent Smith was seated next to Defendant, but was not looming over him in any way. (Tr. 30).  No agents assumed a threatening position with Defendant, no agents had their weapons drawn.  (Tr. 30).

## II.   LEGAL ANALYSIS

### A.   Defendant's Statements Should not be Suppressed Because They Were not Elicited by Interrogation for the Purposes of Miranda

Defendant contends that statements he made to Special Agent Jimenez should be

47

suppressed because Special Agent Jimenez unlawfully interrogated him while he was in custody prior to giving him Miranda warnings when Special Agent Jimenez asked him whether it was his bedroom, whether the pills on the dresser belonged to him, and the reason why they were prescribed. In response, the Government argues the questions Special Agent Jimenez posed concerning Defendant's potential medical needs are more akin to routine biographical information and not interrogation for which the strictures of Miranda come into play.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000). In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations. Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient). The Supreme Court held in Miranda that the Government may not use a defendant's statements elicited during a custodial interrogation unless officials provide specific warnings concerning the defendant's rights against self-incrimination beforehand. United States v. Woods, 684 F.3d 1045, 1055 (11th Cir. 2012).

The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v.

48

Innis, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" of express questioning occurs when officers use "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Id. at 301.  Even express questioning, when it is not likely to elicit an incriminating response, might not be considered interrogation as contemplated by the Court in Miranda.  For instance, law enforcement questions pursuant to routine booking procedures, questions which were part of small talk conversation, and attempts to clarify a request to remain silent have not been considered interrogation within the meaning of Miranda.  Pa. v. Muniz, 496 U.S. 582, 600-01 (1990) (questions regarding the suspect's name, address, height, weight, eye color, date of birth, and age were not considered interrogation); United States v. Jules, 244 F. App'x 964, 973 (11th Cir. 2007) (questions as to why defendant was laughing were not interrogation but rather casual conversation); United States v. Muhammad, 196 F. App'x 882, 886 (11th Cir. 2006) (questions designed to clarify a request to remain silent were not interrogation).

In this case, this Court cannot conclude that Special Agent Jimenez's question about the purpose of the medication on a dresser within Defendant's bedroom was interrogation within the purposes of Miranda.  There are no facts indicating that the purpose of the questions directed to Defendant was to elicit an incriminating response or that the questions could be expected to elicit an incriminating response.  Indeed, it was not unreasonable for Special Agent Jimenez to be concerned about Defendant's

49

need to take medication because he observed the pill bottles on the dresser within the bedroom where Defendant had been sleeping and it was 6:30 in the morning. Thus, it would be a reasonable assumption for Special Agent Jimenez to be concerned that Defendant might need to take his medication first thing in the morning prior to being subjected to the possibly lengthy administrative process of arrest. Under these circumstances, this Court cannot conclude that Special Agent Jimenez's question about the purpose of the medication was interrogation for the purposes of Miranda. See, e.g., United States v. Farlee, 910 F. Supp. 2d 1174, 1181 (D.S.D. 2012) (concluding that an officer's question as to what happened to the defendant's arm was not interrogation because the question did not relate to the crime the officer was investigating and the question was not designed to invoke an incriminating response, but rather to determine the extent of the arm injury the defendant brought to the officer's attention); United States v. Donaldson, No. 4:10-CR-047-01-HLM, 2011 WL 1597685, at *8 (N.D. Ga. Apr. 26, 2011) (concluding that routine biographical questions and a question about the defendant's health were not interrogation within the meaning of Miranda because they were not asked for the purpose of eliciting incriminating responses); cf., United States v. Easchief, 363 F. App'x 526, 527-28 (9th Cir. 2010) (holding that an emergency medical technician's question about what was going on was not interrogation because there was no reason that the EMT should know that the question was reasonably likely to elicit an incriminating response because the EMT was evaluating whether the defendant was disoriented and the defendant had previously answered similar questions

50

without incriminating himself).    Additionally, this Court is not persuaded by Defendant's argument that providing him with medical help constituted "psychological conditioning" designed to elicit incriminating statements.  There is no indication that Defendant would be susceptible to making incriminating remarks just because law enforcement agents acted to ensure that he did not go without his medication prior to being arrested or that it was the agents' intent to persuade Defendant to make incriminating remarks.

        For the same reasons, the question as to whether the room was Defendant's bedroom also was not interrogation.  There is no indication that the identification of Defendant's bedroom was intended to elicit an incriminating response.  There was no showing that authority over the bedroom was somehow at issue in this case.  Although Defendant argues the question was designed to illicit an incriminating response because agents planned to search the residence if they obtained Defendant's consent and Defendant's affirmative response would tie him to the objects in the bedroom, there is no indication here that possession of the residence was in doubt.  It appears that Defendant was already connected with the bedroom in that he appeared to have been sleeping in it.  Furthermore, it is apparent that the question was intended to help Special Agent Jimenez locate clothes for Defendant, who was being arrested while only wearing his pajama bottoms, and not to obtain an incriminating response.   Under these circumstances, the question posed to the Defendant was not interrogation. United States v. Fleck, 413 F.3d 883, 892-93 & n.2 (8th Cir. 2005) (concluding that request for

51

bedroom key during search did not constitute interrogation because it was not intended to elicit an incriminating response); United States v. Walker, 871 F. Supp. 1, 2 (D.D.C. 1994) (concluding that officer's routine question as to identification of bedroom was not interrogation as it was not designed to elicit an incriminating response); cf. United States v. Sims, 719 F.2d 375, 378-79 (11th Cir. 1983) (concluding that a government agent's elicitation of biographical information such as an address and telephone number for the non-interrogation purpose of identification was not interrogation).

Defendant further contends that statements made after he waived his Miranda rights also should be suppressed because the manner in which Analyst Pagan procured the waiver of his rights was misleading. In support, Defendant contends that Analyst Pagan misled Defendant into waiving his rights when she told him that if he agreed with the Advice of Miranda Rights form, he should sign the form. Defendant theorizes that Defendant's assent on the form might only show that he agreed that the document stated his legal rights. Thus, Defendant argues his signature does not necessarily mean he agreed to waive his rights. Neither party, however, presents any evidence of any interrogation or incriminating statements subsequent to Defendant's execution of the waiver. Thus, it is not clear to this Court what Defendant is seeking to suppress and the omission of facts concerning any subsequent statements denies the Court the opportunity to determine whether the circumstances surrounding such subsequent statements warrant suppression. Accordingly, the point appears to be moot. Even if it is not a moot point, in this Court's view, the Waiver of Rights form and Analyst Pagan's

explanation of the form was not misleading.  The form clearly states before the signature line that Defendant has read the statement of his rights, understands what his rights were, and was willing to answer questions without a lawyer present.  (Tr. 23, Exs. 1, 1A).  Moreover at the time, Defendant appeared to understand what the document was, what it said, and he did not ask any questions.  (Tr. 25).

### B.      Defendant Voluntarily Gave Consent to Search his Residence and Vehicles

Defendant argues evidence obtained from the warrantless search of his residence and a Mercedes located on his property also should be suppressed because he did not knowingly, intelligently, and voluntarily consent to the search.  In support, Defendant argues the circumstances surrounding his consent were coercive because agents tried to create a rapport with him prior to seeking his consent by addressing his potential medical needs and engaging him in small talk.  In addition, Defendant contends the Consent to Search form that he signed did not adequately convey that his consent also included consent to conduct a search of his vehicles and their compartments.  Lastly, Defendant contends that Sergeant Chapeau of the Georgia State Patrol performed a K-9 search of his residence and his Cadillac Escalade, but has not shown that the dog was trained to only alert at the presence of narcotics.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable

53

... subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). An exception to the requirement that law enforcement obtain a warrant to search a person's residence is when consent is given by an individual possessing authority to do so. Georgia v. Randolph, 547 U.S. 103, 106 (2006), citing Schneckloth, 412 U.S. at 222. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice" and "not the result of duress or coercion, express or implied." Am. Fed'n of State, Cnty. and Mun. Emp. Council 79 v. Scott, 717 F.3d 851, 874 (11th Cir. 2013); United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995). The principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession--i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances. See Johnston v. Tampa Sports Authority, 530 F.3d 1320, 1326 (11th Cir. 2008), cert. denied, 555 U.S. 1138 (2009); Tovar-Rico, 61 F.3d at 1535. Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. Schneckloth, 412 U.S. at 226; Johnston, 530 F.3d at 1326; United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999). Ultimately, the burden is on the Government to prove the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily. United States v.

54

Schmitz, 469 F. App'x 772, 773 (11th Cir. 2012); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993).

Applying the law to the facts of this case, it is apparent that Defendant gave his consent to the search voluntarily and not as a result of coercion or duress. First, although at times Defendant was handcuffed, the overall environment was not coercive. Instead of engaging in threatening behavior, law enforcement agents ensured that Defendant's medical needs were met, allowed him to take medication, and provided him with a snack. (Tr. 8). None of the agents assumed a threatening position with Defendant, and none of the agents had their weapons drawn. (Tr. 30). Indeed, Defendant did not appear to be threatened. While Defendant "was not happy," he freely conversed with Special Agent Jimenez and Analyst Pagan, at times making small talk and jokes. (Tr. 9). Although the law enforcement officers came to effect the arrest warrant early in the morning, Defendant had ample time to wake up before consenting to the search as there was time for Defendant to have his blood pressure taken, eat a snack, and converse with Special Agent Jimenez and Analyst Pagan before consenting to the search.

Defendant argues the environment was coercive in that agents secured his consent by creating a rapport and seeing to any medical needs that he might have. Under the facts of this case, however, there is no indication that Defendant's will was overborne by the law enforcement agents' thoughtfulness or that Defendant's capacity to enter into his own free choice was particularly susceptible to the influence of the agents simply

because they ensured that he was healthy or conversed with him.  Defendant clearly understood that he had the right to refuse consent because Agent Pagan twice read Defendant the Consent to Search form in Spanish which indicated not only that he was giving his permission to search voluntarily, but also that he has been advised of his right to refuse consent.  (Tr. 28, Exs. 2, 2A).  At that time, Defendant signed the document, he did not appear troubled or incapacitated, he did not appear ill, he did not ask any questions, and he appeared to understand Analyst Pagan's Spanish.  (Tr. 21, 28-30). Therefore, based on Defendant's demeanor at the time the Consent to Search form was given to him, Defendant's lack of questions, and the lack of coercive behavior on the part of law enforcement, this Court concludes that Defendant understood that he was giving his consent for the search and that his consent was voluntarily given.  Cf. United States v. Malloy, 34 F. App'x 520, 522 (9th Cir. 2002) (finding that police conduct in obtaining unrequested medical treatment for defendant's minor injuries was not coercive because there was no showing that it overbore Defendant's will or capacity to resist questioning or impaired his ability to make rational choices).

### C.   Defendant's Consent Included Consent to Search Vehicles on the Property as Well as the Compartments Within the Vehicles

Defendant further contends that items seized from his vehicles, such as a firearm and ammunition located in the glove compartment of his black Mercedes, pursuant to his execution of the consent form, should be suppressed because the consent form Defendant signed did not evidence his agreement to search boxes, bags, and compartments within the vehicles on his property.  In support, Defendant contends that

56

although the consent to search form indicates that he was giving his consent to search "all vehicles, the residence, everything in the property, including all of the boxes, bags, and compartments in it," the pronoun "it" referred to his residence and not the vehicles. Defendant contends that "it" meant the residence because the Spanish words for "in it" were "en ella," that "ella" refers to a female singular direct object, and the female singular direct object in the sentence was "the residence." Defendant points out that Analyst Pagan testified that "en ella" clearly refers to the house. (Tr. 36). According to Defendant, the word vehicles in Spanish requires a masculine plural pronoun.

This Court finds that Defendant's general consent to search his vehicles included his consent to search the vehicles' compartments. A consensual search is manifestly reasonable so long as it remains within the scope of the consent and whether any limitations are placed on the scope of the consent is determined by the totality of the circumstances. United States v. DeJesus, 435 F. App'x 895, 902 (11th Cir. 2011); United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992). When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless; rather it is constrained by the bounds of reasonableness–that is what a police officer could reasonably interpret the consent to encompass. Martinez, 949 F.2d at 1119. There is no requirement for law enforcement officers who wish to search closed containers within a car to separately request permission to search each container. Fla. v. Jimeno, 500 U.S. 248, 252 (1991). If a suspect's "consent would reasonably be understood to extend to a particular container,

57

the Fourth Amendment provides no grounds for requiring more explicit authorization."
<u>Jimeno</u>, 500 U.S. at 252.  To that end, forcing open locked compartments or containers
within vehicles has been held to be within the scope of general consent searches.
<u>Martinez</u>, 949 F.2d at 1121.

In this case, Defendant gave his unbridled consent to search not only his property,
but also, the vehicles on the property.  The consent form Defendant signed gave the FBI
agents unrestricted consent to search all of Defendant's vehicles.  It was therefore
reasonable for the law enforcement officers to interpret Defendant's unlimited consent
to encompass compartments within Defendant's vehicles.  <u>See</u> <u>Martinez</u>, 949 F.2d at
1119-21 (concluding that the defendant's general consent to search warehouse included
permission to search inside of it and to pry open and search the locked trunk).

Finally, Defendant contends that a dog sniff search performed on a Cadillac
Escalade located at his residence was unlawful to the extent that the dog did not have
proper training or certification in detecting narcotics.  Docket Entry [74], pp. 7-8.   In
response, the Government states that a bates-stamped copy of the dog's certification
score sheet has been provided to Defendant's counsel and that in a telephone call shortly
afterwards, counsel for both parties discussed the parameters of the evidentiary hearing.
Counsel for the Government explains that based on this conversation, the documentation
provided for the dog satisfied Defendant's counsel, and that the suppression hearing
would only focus on the issue of consent.  The Government also provided a copy of the
dog's certification score sheet in support of its opposition to Defendant's Motion to

58

Suppress.  Defendant did not raise the certification issue during the hearing or in reply to the aforementioned response by the Government.  Accordingly, the parties appear to have resolved the issue of the dog sniff search.[4]

## DEFENDANT'S MOTION FOR DISCLOSURE AND INTERVIEW OF GOVERNMENT INFORMANTS

Defendant contends that under Roviaro v. United States, 353 U.S. 53 (1957), the Government should be compelled to identify the names of the confidential informants who are alleged to have participated in the acts forming the basis of the indictment against him.  Defendant also requests that the Government be required to inform him of the informants' current addresses as well as the name and phone number of their attorneys and to make the informants available at a time and location convenient to counsel.  Defendant also requests all files and records relating to the informants including the case file, the pedigree file, contracts with any agency, payment records, contact logs, and polygraph results, criminal records, psychological history, federal income tax records, documents referencing an agreement between the Government and the informants, and police or investigative reports of the informants' arrest. Alternatively, Defendant requests that the Court conduct an in camera hearing to

---

[4] Defendant also argues the dog sniff search should be suppressed as fruit of the poisonous tree due to the prior illegal wiretaps, unlawful arrest, and invalid consent to the search.  As discussed above, however, the wiretaps and arrest were legal and Defendant validly gave his consent to search the vehicles on his property.  See, e.g., United States v. Duncan, 356 F. App'x 250, 253 (11th Cir. 2009) (general consent to search residence included consent to dog sniff search of container within residence); United States v. Woods, 445 F. Supp. 2d 1328, 1332-33 (M.D. Ala. Aug. 14, 2006) (officers would reasonably interpret general consent to search a car as including consent to perform dog sniff search).

59

ascertain whether the Defendant is entitled to the aforementioned information about the informants. Defendant contends that he is entitled to information about the informants because in this case, the confidential informants made controlled telephone calls, participated in controlled buys, participated in undercover meetings, and arranged the purchase of drugs and the delivery of money. Defendant further notes that two informants were paid by the Government. Defendant also contends that the Government may have offered inducements, may have attempted to persuade Defendant to participate in criminal activity, or may have supplied instrumentalities of the crime including a telephone. In response, the Government contends that it is not required to disclose the informants' identities at this time because it intends to call them as witnesses at trial. Additionally, the Government contends that Defendant has not made the required showing because he has not shown how the informants' testimony will aid his defense and the Government's interest in ensuring the informants' safety outweighs Defendant's interest in disclosure.

The Government has a limited privilege to withhold the identity of a confidential informant. Roviaro v. United States, 353 U.S. 53, 60-61 (1957); United States v. Flores, 572 F.3d 1254, 1265 (11th Cir. 2009). In Roviaro, the Supreme Court held, however, that "[w]here the disclosure of a confidential informer's identity or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the privilege must give way." Flores, 572 F.3d at 1265, citing Roviaro, 353 U.S. at 60. Courts analyzing Roviaro, however, have

60

determined that the holdings of <u>Roviaro</u> do not apply when the informants will testify at trial.  As indicated in subsequent Supreme Court precedent, "[t]he issue of evidentiary law in <u>Roviaro</u> was whether (or when) the Government is obliged to reveal the identity of an undercover informer *the Government does not call as a trial witness*." <u>Banks v. Dretke</u>, 540 U.S. 668, 697 (2004) (emphasis added).  In contrast, in this case, the Government has indicated that it intends to call its confidential informants as witnesses during the trial of this case and will disclose the identity of the informants and provide any related Jencks Act and <u>Giglio</u> materials related to informants one week prior to the trial.  (Gov't's Br. 5-6; Def.'s Br. 8).  Thus, <u>Roviaro</u> is not applicable to this case.  <u>See, e.g.</u>, <u>United States v. Pineda</u>, No. 1:11-CR-00006-CAP-JFK, 2012 WL 2906758, at *44 (N.D. Ga. June 4, 2012) (N.D. Ga. Jul 16, 2012)  (R&R adopted by Panell, J. in 2012 WL 2907447 (N.D. Ga. July 16, 2012); <u>United States v. Lozano-Vasquez</u>, No. 1:11-CR-302-3, Docket Entry [96], pp. 3-4 (Oct. 25, 2011); <u>United States v. Elder</u>, No. 1:10-CR-132-RWS-AJB, 2010 WL 5656687, at *6-7 (N.D. Ga. Dec. 16, 2010); <u>see also</u> <u>United States v. Casseus</u>, 282 F.3d 253, 257 (3rd Cir.2002) (finding reliance on <u>Roviaro</u> inappropriate because that case "address[es] the duty of the prosecution to disclose the identity of confidential informants who will not testify"); <u>United States v. Perkins</u>, 994 F.2d 1184, 1190 (6th Cir. 1993).

Because <u>Roviaro</u> does not require disclosure of the informants' identities and information at this juncture, Defendant cannot access this information unless some other authority requires early production of this information.  Under <u>Brady v. Maryland</u>, 373

U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the Government, pursuant to the Due Process Clause, must disclose impeachment evidence and other evidence favorable to Defendant.  <u>United States v. Quinn</u>, 123 F.3d 1415, 1421 (11th Cir. 1997).  Thus, Defendant will learn the identities of the informants and will obtain Jencks Act, <u>Giglio</u>, and <u>Brady</u> materials relating to the informants prior to their testimony, thereby alleviating the concerns raised by the Supreme Court in <u>Roviaro</u>. <u>Elder</u>, 2010 WL 5656687, at *6.  The principles of law espoused in <u>Brady</u> and <u>Giglio</u> do not otherwise provide, however, a defendant with a constitutional right to discovery in a criminal case.  <u>Id.</u>  The Government does not have a general duty to disclose a list of its witnesses or information about those witnesses prior to trial.  <u>United States v. Johnson</u>, 713 F.2d 654, 659 (11th Cir. 1983).  Also, the Federal Rules of Criminal Procedure do not "requir[e] the Government to supply witness lists or witness statements until that witness has testified on direct examination, unless such information is required sooner by <u>Brady</u> or <u>Giglio</u>."  <u>Elder</u>, 2010 WL 5656687, at *5.

The Government has indicated that it will produce the identity of the informants as well as any information related to the informants, such as information required pursuant to the Jencks Act, <u>Brady</u>, and <u>Giglio</u> material, prior to trial.  Accordingly, the Court need not address whether production of such information is required under <u>Brady</u>, <u>Giglio</u>, or the Jencks Act.  Defendant contends, however, that disclosure of the informants' identities and information about the informants should occur immediately instead of on the eve of trial.  In support, Defendant contends that he needs information

62

pertaining to the informants now because Special Agent Connolly relied on information the informants supplied to establish probable cause to intercept his telephone and Special Agent Connolly's Affidavits do not show that information supplied by the informants were reliable and credible.  This is not a valid ground for ordering earlier disclosure of informants' identities.  United States v. Mendoza, 433 F.2d 891, 894 (5th Cir. 1970) ("But the rule is well-established that the Government need not disclose the identity of an informer when the sole purpose to be served is to attack the probable cause supporting a search warrant."); Pineda, 2012 WL 2906758, at *45; Lang v. Tucker, No. 5:09CV229/RS/EMT, 2011 WL 5426542, at *11 (N.D. Fla. Oct. 18, 2011); see also United States v. Booker, 131 F. App'x 234, 240-41 (11th Cir. 2005) (in denying request for disclosure, the court noted that informant's testimony only would have been relevant for establishing whether the Government had probable cause to search the defendant's residence); United States v. Gray, 47 F.3d 1359, 1365 (4th Cir. 1995). Furthermore, as discussed above, sufficient evidence within Special Agent Connolly's Affidavits supports a finding of probable cause even without considering information supplied by informants.

Defendant also argues the Government should be compelled to disclose Brady and Giglio information as well as information about the informants now rather than on the eve of trial because if disclosure is delayed, Defendant's ability to review and investigate the information regarding the informants' credibility and prepare his own defenses and alibis to the alleged information will be impaired.  Defendant contends that

63

at present, discovery does not provide him with information necessary for his defense, such as specific information regarding alleged drug transactions that occurred.

Brady and Giglio materials only must be disclosed in time for it to be put to effective use in cross examining witnesses at trial. Flores v. Satz, 137 F.3d 1275, 1278-79 (11th Cir. 1998); United States v. Bailey, 123 F.3d 1381, 1399-1400 (11th Cir. 1997); United States v. Bueno-Sierra, 99 F.3d 375, 379 (11th Cir. 1996); Pineda, 2012 WL 2906758, at *45. Time after time, the Eleventh Circuit has concluded that there was no constitutional violation even when Brady or Giglio materials are supplied after the start of the trial. Bailey, 123 F.3d at 1399-1400; Bueno-Sierra, 99 F.3d at 379 (explaining that it was not error when Government produced impeachment evidence against their witness during the trial because the trial court recessed for the remainder of the day and allowed additional cross-examination the next morning); United States v. Burroughs, 830 F.2d 1574 (11th Cir. 1987).

Because the holding in Roviaro does not apply to the circumstances here, the question is whether early disclosure of the identities of the informants is material and necessary for adequate preparation of Defendant's defense. United States v. Chaplinski, 579 F.2d 373, 375 (5th Cir. 1978) (holding that with the exception of capital cases, the granting of a defense request for disclosure of adverse witnesses is a matter of judicial discretion upon the defendant's showing that such disclosure is both material to the preparation of the defense and reasonable in light of the circumstances); Downing v. United States, 348 F.2d 594, 599 (5th Cir. 1965); Elder, 2010 WL 5656687, at *5-7.

64

Barring unfairness of sufficient gravity, a defense counsel is not entitled to know in advance of trial who will testify for the Government. United States v. Davis, 888 F.2d 1392, at *2 (6th Cir. 1989) (rejecting defendant's argument that identities of the Government's testifying witnesses must be disclosed because "it would have enabled him to more readily attest to his whereabouts on the dates in question and would have enabled him to more effectively challenge witness credibility" because unfairness to defendant must be far greater than what the defendant alleged). Something more than the speculation or anecdotal accounts about the possible usefulness of the informants' testimony is required before early disclosure is ordered. Elder, 2010 WL 5656687, at *7; United States v. Gaines, No. 3:09CR22, 2009 WL 2849733, at *4 (M.D. Tenn. Sept. 2, 2009); United States v. Glover, 583 F. Supp. 2d 5, 12 n.10 (D.D.C. 2008) (explaining that defendant was not entitled to early disclosure of testifying informants because the Government has no duty to disclose its witness list in advance of trial in noncapital cases and the defendants failed to offer a persuasive reason for early disclosure); United States v. Cooper, 91 F. Supp. 2d 79, 86 (D.D.C. 2000) (noting that "[t]he mere speculation by the defense, barren of specific supportive information, that an informer's testimony might be of some benefit to the defense is insufficient to overcome the public interest in protecting informants" and indicating that it was proper for the Government to provide the information about the identities of the informers when the Government provides its witness list).

In this case, Defendant argues discovery provided by the Government has omitted

65

crucial facts necessary for his defense which could be obtained from the informants and/or confidential human sources.  According to Defendant, the Government has omitted to provide information that he could obtain if he had access to the informants such as information about Defendant's alleged habits, intentions, and associates, specifics of money pick up by Defendant, and details about a confidential human source obtaining a ledger from Defendant's residence.  This Court, however, is not convinced that postponing the revelation of the confidential sources a week before trial will prejudice the Defendant.  Not only will Defendant have access to the identities of the confidential informants prior to trial and can investigate at that time, but Defendant will also have a chance to cross-examine them at trial.  To the extent that some portion of the information requires further investigation which cannot be done in the week before trial, Defendant can seek a delay of the trial at that time, if necessary, so that additional investigation can be accomplished.  Accordingly, Defendant's Motion Motion for Disclosure and Interview of Government Informants and/or an In Camera Hearing is **DENIED**.  Docket Entry [75].

## CONCLUSION

Based on the foregoing, Defendant's First Particularized Motion to Suppress Evidence and Statements (Docket Entry 74), Motion for Disclosure and Interview of Government Informants and/or an In Camera Hearing (Docket Entry 75), and First Particularized Motion to Suppress Evidence and Statements Illegally Seized Pursuant to Title III Orders (Docket Entry 82) should all be **DENIED**.

**SO ORDERED, REPORTED AND RECOMMENDED** this   15   day of November, 2013.

/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE